AO 93  (Rev. 11/13) Search and Seizure Warrant  (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | | |
|---|---|---|---|
| In the Matter of the Search of | ) | | |
| A Samsung cell phone with no visible serial number, with | ) | | |
| an IMEI number 354807091813139, black in color, seized | ) | Case No. | 8:19-MJ-00794-DUTY |
| on October 2, 2019 and currently maintained in the | ) | | |
| custody of the Drug Enforcement Administration in Santa | ) | | |
| Ana, California. | ) | | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Central _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before     14 days from the date of its
_____ issuance _____ *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     the U.S. Magistrate Judge on duty at the time of the
                                         return through a filing with the Clerk's Office .
                                         *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____          _____
                                                              *Judge's signature*

City and state:       Santa Ana, California          HONORABLE KAREN E. SCOTT, U.S. Magistrate Judge
                                                              *Printed name and title*

AUSA: J. Nare (x3549)

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>8:19-MJ-00794-DUTY | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-3

SUBJECT DEVICE 3 is a Samsung cell phone with no visible serial number, with an IMEI number 354807091813139, black in color, seized on October 2, 2019 and currently maintained in the custody of the Drug Enforcement Administration in Santa Ana, California.

**ATTACHMENT B**

I.    **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the Subject Offenses;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages, SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the Subject Offenses;

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of

drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.   Audio recordings, pictures, video recordings, or still captured images related to the possession, purchase, sale, transportation, or distribution of drugs;

f.   Contents of any calendar or date book;

g.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

       v.  evidence of the times the device was used;

       vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

       vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

       viii.    records of or information about
Internet Protocol addresses used by the device;

       ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

## II.  <u>SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)</u>

3.    In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also

iv

search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.  If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, LESLIE FRANCO, being duly sworn, declare and state as follows:

### **I.  PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrant against John Anthony TERRONES ("TERRONES") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute Methamphetamine.

2.   This affidavit is also made in support of an application for warrants to search the following digital devices in the custody of the Drug Enforcement Administration, in Santa Ana, California, as here and in Attachments A-1 through A-4:

a.   A black Samsung cell phone with serial number 015126004393035 ("SUBJECT DEVICE 1");

b.   A gray and black Samsung cell phone with serial number 860667043484117("SUBJECT DEVICE 2");

c.   A black Samsung cell phone with no visible serial number, with an IMEI number 354807091813139 ("SUBJECT DEVICE 3"); and

d.   A black and silver ACER laptop with serial number 35207575876 ("SUBJECT DEVICE 4") (collectively, the "SUBJECT DEVICES").

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846

(conspiracy and attempt to distribute controlled substances)
(the "Subject Offenses"), as described more fully in Attachment
B.  Attachments A-1 through A-4 and B are incorporated herein by
reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrants, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. **BACKGROUND OF AFFIANT**

5.    I am a Task Force Officer ("TFO") with the United
States Department of Justice, Drug Enforcement Administration
("DEA") and have been so employed since November 2017.  I am
currently assigned to the DEA's Los Angeles Field Division
("LAFD"), Orange County Resident Office ("OCRO").  At the OCRO,
I am assigned to Task Force Group One.  As such, I am an
"investigative or law enforcement officer" of the United States
within the meaning of Title 18, United States Code, Section
2510(7); that is, an officer of the United States empowered by
law to conduct investigations of, and to make arrests for,
offenses enumerated in Title 18, United States Code, Section
2516.  I am presently employed as a Detective for the Orange

Police Department and have so been employed by the City of
Orange since February 2001.

6.    Throughout my law enforcement career, I have
investigated individuals and criminal organizations that have
represented a significant threat to public safety and national
security.  Specifically, during the course of my employment, I
have received instruction to include such topics as drug
identification, money laundering techniques, patterns of drug
trafficking, complex conspiracies, the exploitation of narcotics
traffickers' telecommunications devices, criminal law,
surveillance, and other investigative techniques.  I have
participated in numerous investigations into the unlawful
importation, manufacturing, possession with intent to
distribute, and distribution of narcotics and controlled
substances, the laundering of narcotics proceeds, and
conspiracies associated with narcotics offenses.  In conducting
these investigations, I have utilized a variety of investigative
techniques and resources, including but not limited to,
surveillance, confidential source debriefings, telephone toll
analysis, and wire communications analysis in Title III and
California State wiretap investigations.

7.    I have participated in many aspects of drug
investigations, including investigations into the smuggling of
illegal drugs, money laundering, and extortion related to drug
trafficking.  I am familiar with narcotics traffickers' methods
of operation, including the manufacturing, storage,
transportation, and distribution of narcotics, the collection of

money that represents the proceeds of narcotics trafficking, and money laundering.  I am also familiar with the manner in which narcotics traffickers transport and distribute narcotics in areas they control.  I am familiar with how drug traffickers utilize counter-surveillance techniques to avoid detection by law enforcement.  I also know that drug traffickers often communicate with their drug-trafficking associates through the use of cellular telephones.  I have become aware that more sophisticated drug trafficking networks now utilize email, cell phones, Voice over Internet Protocol, video chat, internet messaging services, and social networking sites to communicate with one another.  During drug-related communications, traffickers often use coded or cryptic language to disguise the drug-related nature of their conversations.  I also know that if narcotics or narcotic proceeds are seized by law enforcement, the subject will continue to "work" to pay off what had been seized.

### III. <u>**SUMMARY OF PROBABLE CAUSE**</u>

8.   On October 2, 2019, Officer Tongkou Xiong of the California State University Fullerton Police Department conducted a traffic stop on a gray Honda Accord, bearing California license plate number 6PJP977 (registered to Sarah Payne at 4702 Autry Avenue, Long Beach, California), for an unsafe lane change and weaving/lane straddling, in violation of California Vehicle Code Sections 22107 and 21658(a), respectively.  The driver, who was later identified as John Anthony TERRONES, did not initially stop when Officer Xiong

initiated his patrol vehicle lights.  Instead, TERRONES
accelerated in an effort to evade the officer.  After a short
pursuit, TERRONES stopped the vehicle.  During the stop,
officers discovered that TERRONES was driving with a suspended
license.

9.    TERRONES was arrested for driving on a suspended
license and evading a police officer in violation of California
Vehicle Code Sections 14601.2 and 2800.1.  Because, TERRONES was
driving while his license was suspended, Officer Xiong requested
a tow truck to impound the vehicle per California Vehicle Code
14601.2.  During an inventory search of the vehicle, officers
located approximately 4.5 pounds of methamphetamine, 40 grams of
heroin, 7.9 grams of cocaine, and 68.3 grams of an unknown
substance.  In addition to the narcotics, officers also located
three cell phones and a laptop computer inside of the vehicle.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following
information.

11.   On October 2, 2019, at approximately 10:04 p.m.,
Officer Tongkou Xiong of the California State University
Fullerton Police Department ("CSUFPD"), was working uniformed
patrol driving a marked police vehicle.  Officer Xiong was
driving northbound in the number one lane on Placentia Avenue,
approaching Madison Avenue.  He then observed a gray Honda
Accord, bearing California license plate 6PJP977, in the number

two lane approximately half a car length in front of Officer Xiong's patrol vehicle.  As Officer Xiong and the gray Honda were approaching Madison Avenue, there was an operating transportation bus stopped just south of Madison Avenue in the number two lane with its lights flashing.  Officer Xiong noticed the Honda was not slowing down as it was approaching the bus. When the Honda was approximately two car lengths away from the bus, the driver, later identified by his California Driver's License (A6895646) as John Anthony TERRONES, merged his vehicle partially into Officer Xiong's lane without signaling, causing Officer Xiong to brake and slow down so the Honda would not collide into the bus.  As the Honda merged into Officer Xiong's lane, half of the vehicle was in the number one lane and the other half was in the number two lane, traveling close to the bus as it drove by, in violation of California Vehicle Code Section 22107, unsafe lane change, and California Vehicle Code Section 21658(a), failure to drive within a single marked lane.

12.  Officer Xiong got behind the Honda to conduct a traffic stop for the aforementioned vehicle code violations just south of Quartz Lane in Fullerton, California.  After Officer Xiong activated his patrol vehicle's lights, the Honda did not slow down, and instead quickly accelerated and aggressively turned east onto Quartz Lane into a known gang neighborhood in Placentia, California.  Officer Xiong gave dispatch the vehicle license plate number and dispatch advised there was a warrant associated with the vehicle.  The Honda then turned north onto Cameo Lane.  Officer Xiong briefly activated his patrol

vehicle's sirens to get the driver to stop.  The Honda slowed
down as it was approaching Pearl Lane and Officer Xiong turned
off his sirens due to being in a gang neighborhood and not
wanting to alert people and cause them to come out of their
homes.  As Officer Xiong turned off his sirens, the Honda again
quickly accelerated and aggressively turned east onto Pearl
Lane.  Officer Xiong again activated his patrol vehicle sirens
and followed eastbound on Pearl Lane.

13.  The Honda came to a stop on Pearl Lane, east of Cameo
Lane in the City of Fullerton.  Officer Xiong exited his patrol
vehicle and ordered TERRONES to turn off his vehicle.  TERRONES
opened his door and tried coming out of his vehicle. Officer
Xiong drew his weapon and ordered TERRONES back into his
vehicle.  Officer Xiong also told TERRONES to place his hands
outside the driver's window.

14.  Officer Xiong requested additional officers to respond
and Corporal Jesse Blanpied and Sergeant Nigel Williams, from
CSUFPD arrived on scene to assist, along with officers from the
Fullerton Police Department.  Officer Xiong ordered TERRONES out
of his vehicle and he was handcuffed by a Fullerton PD Officer.
Officer Xiong, Sergeant Williams and Corporal Blanpied looked
for additional subjects in the vehicle and did not find anyone
else inside.

15.  Officer Xiong conducted a wants/warrants check on
TERRONES and dispatch advised that TERRONES' driver's license
was suspended as of November 11, 2018.  TERRONES was also
determined to be a documented gang member from the criminal

street gang "PLAS" with the moniker "Tweedy."  The territory for
the PLAS criminal street gang is in the City of Placentia;
however, the area TERRONES was traveling through during the
traffic stop was a gang neighborhood under control of the rival
street gang "Wicked Minds" in the City of Fullerton.  Officer
Xiong placed TERRONES under arrest for violations of California
Vehicle Code Section 14601.2, driving on a suspended license,
and California Vehicle Code Section 2800.1, evading a police
officer.

16.  Officer Xiong read TERRONES his <u>Miranda</u> Rights from
Officer Xiong's department issued <u>Miranda</u> Card.  TERRONES said
"Yes" to all four questions asked, and stated he understood his
rights.  TERRONES said he did not wish to answer any questions.
Due to TERRONES driving on a suspended license, Corporal
Blanpied completed a California Highway Patrol 180 form to
impound the Honda for 30-days per California Vehicle Code
Section 14602.6, driving on a suspended license.

17.  Sergeant Williams and Officer Xiong then conducted an
inventory of the vehicle.  During the inventory check, Officer
Xiong inventoried the driver's side of the vehicle and opened
the center console.  Officer Xiong saw a Ziploc bag containing a
white crystalline substance.  As Sergeant Williams was
inventorying the rear of the vehicle, he located a black Aldo
shoe box on the rear seat.  Sergeant Williams opened the shoe
box and saw three vacuum-sealed bags containing a white
crystalline substance.  Sergeant Williams saw a black sports bag
laying on the rear driver's side floorboard and opened it.

Inside the black sports bag, Sergeant Williams found a navy blue
"Prada" bag.  Officer Xiong searched the bag's bigger
compartment and found five different individual bags, containing
a white crystalline substance.  On the side of the Prada bag was
another zipper compartment.  Inside that compartment, Officer
Xiong located three smaller individual bags containing a white
crystalline substance, five individual bags containing a black
tar substance, and one individual bag containing a white powdery
substance.  Based on Officer Xiong's training and experience,
the white crystalline substances were consistent with
methamphetamine, the black tar substance was consistent with
heroin, which was also supported by the vinegar odor emitting
from the bag, and the fine white powdery substance was
consistent with cocaine.[1]

18.  Officer Xiong looked inside the black sports bag
located on the rear driver side floorboard, and observed a
cylindrical item that was tightly wrapped with clear plastic
that contained an unknown substance.  Officer Xiong searched the
rest of the vehicle and located **SUBJECT DEVICE 1, SUBJECT DEVICE
2,** and **SUBJECT DEVICE 3**.  Additionally, **SUBJECT DEVICE 4** was
located on the rear passenger floorboard.  Officer Xiong
collected the **SUBJECT DEVICES** to be booked into evidence.  While
TERRONES was in custody, SUBJECT DEVICE 1, SUBJECT DEVICE 2, and
SUBJECT DEVICE 3 had all been receiving numerous phone calls and
text messages from various numbers.

_____

[1] The substances were not field tested due to CSUF PD
policy, which prohibits individual testing of controlled
substances for safety reasons.

9

19.   Officer Xiong transported TERRONES back to CSUFPD for booking.   The Honda vehicle was towed by Anaheim/Fullerton Tow to their facility per California Vehicle Code Section 22655.5, hold for evidence, and California Vehicle Code Section 14602.6, 30-day impound.

20.   At CSUFPD, Corporal Blanpied and Officer Xiong searched TERRONES wallet and personal belongings incident to arrest.   TERRONES had $604.65 in U.S. currency on his person. Inside TERRONES wallet, Corporal Blanpied and Officer Xiong confiscated a Bank of America visa card in a name other than defendant.   Officer Xiong also collected miscellaneous documents and business cards with people's names, phone numbers, and addresses on them, including a document for a storage unit in Fullerton (Myself Storage Space, 201 S. Balcom Ave).

21.  Sergeant Williams, Corporal Blanpied and Officer Xiong retrieved the evidence out of Sergeant Williams' patrol car and brought the evidence into CSUFPD for processing.   Officer Xiong later weighed out each of the controlled substances separately, which consisted of the following:

a.   Three individual bags containing 458.4 grams, 458.4 grams, and 457.8 grams of a white crystalline substance that appeared to be methamphetamine, located inside the Aldo shoe box (DEA EXHIBIT 1);

b.   A bag containing 297.9 grams of a white crystalline substance that appeared to be methamphetamine, located in the center console (DEA EXHIBIT 2);

c.   Five individual bags containing 114.6 grams, 113.9 grams, 113.6 grams, 60.2 grams, and 15.1 grams of a white crystalline substance that appeared to be methamphetamine, located in the Prada bag (DEA EXHIBIT 3);

d.   Three individual bags containing 7.1 grams, 1.7 grams, and 0.3 grams of a white crystalline substance that appeared to be methamphetamine (DEA EXHIBIT 4);

e.   Five individual bags containing 26.4 grams, 4.6 grams, 3.4 grams, 3.3 grams, and 3.1 grams of a black tar-like substance that appeared to be heroin (DEA EXHIBIT 5), and one bag containing 7.9 grams of a white powdery substance that appeared to be cocaine (DEA EXHIBIT 6), located in the Prada bag's side compartment;

f.   One cylindrical package, weighing 68.3 grams of an unknown substance, located inside the black sports bag (DEA EXHIBIT 7).

22.   On October 10, 2019, I obtained DEA EXHIBITS 1 through 7 from CSUFPD for transfer to the DEA Southwest Laboratory for testing.  Upon receiving the exhibits, I observed the following:

a.   DEA EXHIBIT 1 is a white crystalline substance contained in three clear vacuum-sealed packages that based on my training and experience, appeared to be methamphetamine.  Each package weighed slightly above a pound.  Based upon my training and experience, I determined that the vacuum-sealed packaging along with the weights were consistent with the manner in which narcotics are packaged for sales.  Further, based on my training

and experience, I know that a pound is a standard unit of sale for a distribution quantity of methamphetamine.

b.    DEA EXHIBIT 2 is a white crystalline substance that, based on my training and experience appeared to be methamphetamine, contained in a clear Ziploc bag with a total weight of 297.9 grams, which is slightly above a half-pound. Based upon my training and experience, I determined that the Ziploc packaging along with the weight was consistent with the manner in which narcotics are packaged for sales.

c.    DEA EXHIBIT 3 is a white crystalline substance that, based on my training and experience appeared to be methamphetamine, contained in five different clear Ziploc bags of varying size and with different weights.  Three of the Ziploc bags weighed approximately a quarter-pound each and the other two Ziploc bags weighed considerably less.  Based upon my training and experience, I determined that the Ziploc packaging along with the weight was consistent with the manner in which narcotics are packaged for sales.

d.    DEA EXHIBIT 4 is a white crystalline substance that, based on my training and experience appeared to be methamphetamine, contained in three small clear Ziploc bags with weights that range from approximately a quarter of a gram to a quarter of an ounce.  Based upon my training and experience, I determined that the Ziploc packaging along with the weight was consistent with the manner in which narcotics are packaged for sales.

12

      e.   DEA EXHIBIT 5 is a black tar substance contained in five small various clear Ziploc bags and clear tied/twisted plastic wrap.  I was able to manipulate the black tar substance through the packaging and felt that it was pliable.  Based upon my training and experience, I determined that the packaging was consistent with the manner in which narcotics are packaged for sales and that the appearance and texture of the substance was consistent with heroin.

      f.   DEA EXHIBIT 6 is a white powdery substance that, based on my training and experience appeared to be cocaine, contained in a clear tied/twisted plastic wrap with a total weight of approximately a quarter of an ounce.  Based upon my training and experience, I determined that the packaging and quantity was consistent with the manner in which narcotics are packaged for sales.

      g.   DEA EXHIBIT 7 is an unknown substance contained in plastic wrap formed into a cylindrical shape.  I was able to manipulate the unknown substance through the packaging and I felt a crackling sensation.  Based upon my training and experience, I determined the packaging was consistent with a manner in which narcotics are packaged when transported inside a body cavity for concealment.  I also determined the crackling sensation was consistent with a crystalline substance, such as, methamphetamine.

13

## V.   <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

23.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices, including cellphones and laptops.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including cellphones and laptops, in the form of calendar entries and location data.

e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices, including cellphones and laptops.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

24.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the

Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures

are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## VII. **CONCLUSION**

28.  For all of the reasons described above, there is probable cause to believe that John Anthony TERRONES has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute Methamphetamine.  There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachments A-1 through A-4.

_____
LESLIE FRANCO
Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn before me
this _____ day of October, 2019.


_____
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE